MARY DULL v. THOMAS S. MERRILL.

*Fraudulent conveyances—Deed of homestead to wife of debtor—Evidence.*

1. The conveyance of a homestead by a husband to his wife is no evidence of an intent to defraud creditors.

2. A wife will not lose her rights as a creditor of her husband by failing to make her claim known, even as against a party who trusted the husband in ignorance of such claim.

3. On a review of the testimony, which was taken in open court, the decree in favor of complainant is affirmed. The case is almost entirely one of fact.

Appeal from Monroe. (Joslin, J.) Argued February 2, 1888. Decided March 2, 1888.

Bill filed by wife to restrain the sale of real estate claimed by her to satisfy a judgment against her husband. Defendant appeals from a decree granting the relief prayed for. Decree affirmed. The facts are stated in the opinion.

*Ira R. Grosvenor*, for complainant.

*J. R. Rauch* and *O. A. Critchett*, for defendant.

LONG, J. The bill in this cause was filled in the circuit court for the county of Monroe, in chancery, to restrain the defendant from selling certain real estate in said county to satisfy a judgment in his favor against Joseph C. Dull, the husband of complainant, in a suit at law commenced by attachment in said circuit court.

The defendant filed his answer in the cause, admitting the levy of the attachment, and claiming that the property described in the bill was conveyed to the complainant by Joseph C. Dull without consideration, and in fraud of cred-

itors. A general replication was filed, and the cause was heard in open court.

Decree was entered in favor of complainant, which provided that—

" Defendant do desist and refrain from proceeding to sell the land of said complainant on any judgment he may obtain under his said attachment suit against said Joseph C. Dull, and he is hereby perpetually enjoined from proceeding to sell the said premises described in said bill of complaint upon any execution which may issue upon any judgment he may obtain against said Joseph C. Dull, and that complainant recover her costs in such proceedings."

From this decree defendant appeals to this Court.

While the record is quite voluminous, and the briefs of counsel discuss many questions, both of law and fact, it seems to us there are but a few questions in controversy in this case. The questions in controversy are presented by defendant's brief, as follows:

" 1. Did the complainant loan her husband money, as she alleges, and was this money still unpaid, and a valid claim in her favor, at the date of the conveyance to her of January 8, 1883, and was the property so conveyed worth no more than the amount of such indebtedness?

" 2. Did the complainant, prior to the purchase by her husband from the defendant of the machinery above mentioned, make to the defendant, or to his agent, representations as to the financial ability of her husband, upon which defendant relied in trusting him; or did she by her silence, or by her conduct in any other way, justify defendant in believing that her husband owned the property, on the strength of the ownership of which he obtained the credit?"

Defendant's counsel also state another proposition as in the case:

" 3. Has the defendant any adequate remedy in the premises without recourse to the property attached to satisfy his claim?"

We shall not discuss this last proposition, as it has no

force, and could in no manner affect the rights of the complainant.

There are certain facts in the case that are undisputed :

That the 40 acres complainant claims as a homestead stood upon the record in the name of Joseph C. Dull, and was occupied by him with his family, and used by him, from the time of his first removal to this State until January 8, 1883.

That the other 40 acres mentioned in the bill also stood in the name of said Joseph C. Dull, and was used and occupied by him and his family for several years prior to said January 8, and that complainant had never before said date held title to either of said parcels, and that after said date no material change took place in the use or occupancy of said property.

That in November, 1882, during the time when said land was so owned and occupied by said Joseph C. Dull, he purchased of defendant certain farm machinery (an engine and clover-huller, amounting in value to $1,470) on credit, giving defendant his own notes for a portion of the purchase money, and for the remainder assigning to him notes of D. R. Bolton, which he indorsed, and for the payment of which he remained liable to defendant; that complainant knew of this purchase at the time; that defendant brought suit in Toledo on said Bolton notes, indorsed by defendant, in December, 1882, and later brought suit upon the other notes; and that complainant knew of the bringing of these suits, and the purpose for which these suits were brought.

That while said Joseph C. Dull was so indebted to defendant, and such indebtedness fully known to the complainant, the said Joseph C. Dull conveyed all his real and personal property to complainant; that this deed of January 8, 1883, to complainant, contained, not only the two 40-acre tracts of land, but also another 40 in the township of Ida, which had been already, in the fall of 1882, bargained by written contract to one Hoover, who received his deed in the spring of 1883; and that part of the purchase money of this 40 was

received and used in payment of some small incumbrance on the land described in the bill, and a part of such money was received and used by Joseph C. Dull.

The testimony bearing upon the question of the indebtedness of Joseph C. Dull to the complainant is that of complainant, Joseph C. Dull, their son David, and one S. M. Bartlett.

The complainant's story of this indebtedness is that in 1853 she received from her grandfather's estate $250, and let her husband have it, and took his note or bond; that she cannot read writing, nor write, but can read a little coarse print; that in 1856 she received from her brother's estate $978; that she let her husband have that, and took his note; that these notes were never paid, nor any interest ever paid upon them, and on January 8, 1883, in settlement for these amounts of money and interest, which at 6 per cent. would amount to over $3,000, she took the deed of the farm from her husband; and that the whole transaction was *bona fide,* and the deed taken in good faith in payment of an honest debt. These statements are corroborated by complainant's husband.

Defendant's counsel now claim that there is no testimony whatever upon the indebtedness of the husband to complainant, except the testimony of husband and complainant. It does appear, however, from the testimony of their son David, that upon one occasion, six or seven years ago, complainant asked her husband to convey the land to her for her debt, and that he agreed to do so; and also from the testimony of S. M. Bartlett, a witness called for complainant, that on September 17, 1877, while he was surveying there, and while staying at the house of the parties overnight, the complainant then wanted her husband to make a deed to her of the land, and said it was bought with her money; that the husband admitted this, and said he would make the deed when he had time.

Defendant's counsel also claim that no weight should be given to the testimony of complainant and her husband, for the reason that they are unable to state the terms of the notes; that they do not produce the notes, nor have they either of them seen the notes for many years; that the husband testifies he never paid any interest on the notes, and complainant testifies, first, that he did pay some interest, and, later, being unable to state when, where, or how the interest was paid, that during all those 30 years she did not ask for interest because she did not need the money; and, especially when the husband testified that the money was put into his hands to handle, and the complainant that she gave it to her husband to take care of, that these facts do not seem to show an intention on the part of the complainant to insist on payment of the money so received by her husband.

These facts, however, were drawn out upon the cross-examination of the witnesses by defendant's counsel. The cross-examination was a rigid one, and it is not surprising that the complainant—a woman wholly unlettered, and after such a length of time—was unable to state more minutely all the details of the transaction between herself and husband in regard to the notes, or their terms or conditions.

It is also claimed by defendant's counsel that the $250 received in 1853 was invested in a house and lot under complainant's direction, and so remained until the spring of 1869, when it was sold, with her approval, for $75, and the money sent to complainant, and invested in the purchase of the homestead, with her consent and approval; that, of the $978 received by complainant from the estate of her brother, between $800 and $900 was invested in land in Pennsylvania; that this investment in land was also made under the direction of the complainant, and she directed her husband to take the deed in his own name; that, after holding this Pennsylvania land for a few years it was sold for $900, which was loaned to a man by the name of Hauser until the fall of

1868, when, with the $75 it was used in the purchase of the homestead described in the bill, under the direction of the complainant; and that the complainant could not thus dictate and control the investment of her money, and at the same time hold her husband responsible for its repayment to her with interest; and that these facts show that, if it was ever intended as a loan to the husband, it was abandoned; that the notes claimed to have been given were utterly dis · regarded, and, under such circumstances it is fair to hold that Dull was his wife's agent in all these investments; and, all these moneys going into the purchase of the homestead, the complainant can have no property in anything further than the homestead 40, and the other 40 should be made liable to the payment of defendant's claim against Joseph C. Dull.

We do not view the testimony in this light. If the complainant's story is true, the husband was her debtor to the amount of the $250 and the $978, and the interest upon it for the years up to the time the deed was taken; and, as between the husband and wife, this was a sufficient consideration for the making of the deed, and the defendant cannot be heard to question it, unless complainant has by some act of her own led the defendant to give her husband credit which he could not have obtained except by her words or· conduct. The testimony shows to our entire satisfaction that the homestead 40 was worth from $1,500 to $1,600; and the other 40 conveyed, and upon which the levy of the attachment was made, was worth not to exceed $800. This was about all the property conveyed to her to pay an indebtedness of over $3,000, as the complainant testifies she made no claim to the Ida 40, and did not know it was included in the deed.

The conveyance of the homestead 40 by Dull to his wife was no evidence of an intent to defraud creditors. *Pulte v. Geller*, 47 Mich. 560 (11 N. W. Rep. 385) ; *Anderson v. Odell*, 51 Id. 492 (16 N. W. Rep. 870) ; *Bank v. McAllister*, 46 Id. 397 (9 N. W. Rep. 446).

It was the duty of Joseph C. Dull to provide a home for his wife and family ; and though the home 40 was bought in his name, and so stood at the time he obtained the credit, the defendant could not levy upon it, or make sale of it in payment of his debt, unless it was of greater value than this is shown to be. The husband could not convey it or incumber it without the consent of complainant, and she was entitled to a home there for herself and· children. We think there was sufficient consideration for the conveyance of the other 40, as well as for the homestead.

The only question, then, for our further consideration, is the second proposition of defendant's counsel:

"Did the complainant, prior to the purchase by her husband from the defendant of the machinery above mentioned, make to the defendant, or to his agent, representations as to the financial ability of her husband, upon which defendant relied in trusting him; or did she by her silence, or by her conduct in any other way, justify defendant in believing that her husband owned the property, on the strength of the ownership of which he obtained the credit?"

The testimony upon this question is somewhat contradictory. The defendant testifies that he is a business man in Toledo, engaged in the sale of agricultural and farm implements; that in September, 1882, Joseph C. Dull came to Toledo, and inquired of defendant the price of an engine and clover huller; that, not being acquainted with him, or with his responsibility, he questioned him, and Dull then told him he owned the 40 acres of land on which he lived, which was worth $60 per acre; that he owned another 40, not far distant from that, worth $30 per acre; and still another 40, on which there was some incumbrance; that the first two forties were clear. He then began to question him on the incumbrance on the third 40, when Dull told him he was perfectly good for an engine and separator, for he did not owe a dollar in the world, and had money at interest.

Afterwards he sent Mr. Chalfant and Mr. Parks out to

investigate Mr. Dull's responsibility before he made the sale.
Mr. Chalfant testifies that he was in the employ of defendant, and about the latter part of September, 1882, he went, at defendant's request, to see Mr. Dull in reference to this sale to him, and to ascertain his responsibility; that he spent the night at his house, and in the morning, in the presence of the complainant, had a conversation with Dull as to his indebtedness and his responsibility; that Dull then described the three 40's he had, and made, in substance, the same statement as to his financial condition he had already made to the defendant at Toledo.

It may be remarked here that, while this witness says this conversation was "in the presence of the complainant," he does not state that she heard it, or took any part in it.

Mr. Parks was also called as a witness for defendant, and testified that in October, 1882, he went with the witness Chalfant to Dull's house to see Dull; that, not finding him at home, he went into the house, while Chalfant went to the barn to look after the horses; that he then had an interview with complainant in the house, in which he learned that Dull was not at home, when he inquired of her if Dull owned "this place here," and, being answered in the affirmative, he then inquired what other land he owned, and was told by her that he owned "another forty over there on this section besides," and that it was all paid for, and that "Mr. Dull is a man who never runs in debt, nor does he owe a cent in the world to anybody;" that, then being asked if he owned any other land besides the two 40's, she said, "Yes, he does own something on the other forty," meaning the Ida 40, "and he has notes and money at interest;" that she then went on, and stated that the homestead was worth $2,500, and made some statement about his horses and cows; that complainant knew his business there; that he told her he had come to see about the Merrill engine, and Merrill wanted to know if Dull was good; that the engine was at Dull's on trial, and

he went there as attorney for defendant to close it up.

After this talk with the complainant, he and Chalfant went over where Dull was at work, and Dull then made the statement to him and Chalfant he had made to defendant at Toledo.

This statement made by witness Parks is the only testimony in the case that complainant ever knew her husband was making representations of his financial condition for the purpose of getting credit, if Dull ever did make any such statements, which he positively denies.  The complainant denies that she ever made any such statements to Parks, and says she was not in the house when he came.  Complainant is corroborated in this by her son, David Dull, who also testifies that no such conversation took place, and that his mother was not in the house while witness Parks was there.

The testimony of the witnesses in the cause was taken in open court, and in presence of the court, who had an opportunity to see them, and to judge of their appearance and fairness; and that court has passed upon this testimony, accepting the theory of the complainant.  We cannot say the court below was in error in believing what complainant says of this transaction.

The burden of proof upon this part of the case being upon the defendant to bring home some knowledge to complainant that her husband was making these representations, and that defendant was about to give him credit upon the belief that he owned this property, we think the court was correct. The testimony of the complainant, corroborated by her son David; the fact that she had a large claim against her husband, as we have no doubt she had; the testimony of Mr. Bartlett that in 1877 she was urging her husband to make the deed to her,—all tend to show the truth of her statements.

The sale to her, under the circumstances shown, was no

fraud upon creditors of her husband.  *Beurmann v. Van.  Buren,* 44 Mich. 496 (7 N. W. Rep. 67).

Complainant would not lose her rights as a creditor of her husband by failing to make her claim known, even as against the defendant, who trusted him in ignorance of it.  *Hyde v. Powell,* 47 Mich. 156 (10 N. W. Rep. 181).

From the whole case, which we have very carefully examined, having had some convictions upon the argument that defendant had some equities in the case, we are satisfied that complainant had a *bona fide* claim against her husband, of a large amount, and that the deed was given to her in good faith, in settlement of her claim, and that such arrangement. was not a fraud upon the defendant.  We are also satisfied that complainant was in no manner instrumental in inducing the defendant to give her husband credit.

The decree of the court below is affirmed, with costs.

The other Justices concurred.